THE CITY OF PLAINFIELD, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. THE COURIER NEWS, A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT, AND THE DAILY JOURNAL, A NEW JERSEY CORPORATION, DEFENDANT-APPELLANT.

Argued January 26, 1976—Decided November 15, 1976.

*Mr. Matthew D. F. Wade* argued the cause for appellant (*Mr. Richard R. O'Connor,* attorney; *Mr. Wade* on the brief).

*Mr. Lawrence Schechterman* argued the cause for respondent Courier News.

*Mr. Edward W. Beglin, Jr.* submitted a statement in lieu of brief on behalf of respondent City of Plainfield.

The opinion of the court was delivered by

MOUNTAIN, J. At issue in this case is the continued eligibility of the *Courier-News,* a daily newspaper, to serve as the official newspaper for the City of Plainfield after moving its headquarters from Plainfield, which is in Union County, to Bridgewater Township, nine miles away in Somerset County. An official newspaper is one designated by the governing body of a municipality, pursuant to *N. J. S. A.* 40:53–1, for the publication of advertisements and notices required by law to be published by the municipality. Statutory publication requirements differ to some extent, as will be pointed out below, but typically they specify that a notice must be published "in a newspaper published and circulating in the municipality, if there be one, and if not, in a newspaper published in the county and circulating in the municipality" (*N. J. S. A.* 40A:2–19, publication of local bond ordinances).

After the removal of the *Courier-News,* the City of Plainfield brought a declaratory judgment action seeking to determine whether it could continue to publish its legal advertisements in the *Courier-News,* and if not, whether the *Daily Journal,* a newspaper published in Elizabeth, was qualified and eligible. The trial court determined that the *Courier-News* was still published in Plainfield and thus remained eligible for designation as an official newspaper. This decision was affirmed by the Appellate Division; a dissent was filed by Judge Halpern, however, chiefly on the ground that in drafting the statutes dealing with publication requirements, the Legislature had not contemplated that a newspaper might be considered to be published in more than one place. The case is thus before us as of right. *R.*

2:2–1(a)(2). We have reviewed the arguments of the parties in the light of both the statutory language and the probable intent of the Legislature. We find ourselves unable to agree with the conclusions reached by the trial court and the Appellate Division majority and hence reverse, in large part for the reasons expressed by Judge Halpern in his dissenting opinion.

The *Courier-News* was incorporated in 1894 as the *Plainfield Courier-News,* a corporate name which it still retains. Until its move to Bridgewater Township, which occurred in March 1972, its newsgathering, editing, printing and circulation operations were centered in Plainfield and the newspaper was entered as second-class mail at the Plainfield post office.[1] Since it has been the only daily newspaper published in Plainfield and has long enjoyed a wide circulation there, it has been for many years designated as Plainfield's official newspaper.

The paper's move to Bridgewater Township took place after the old printing presses at the Plainfield office "just fell apart," as its publisher testified. Larger and more modern facilities were constructed at which over 200 persons are presently employed. The executive offices are located there, and most of the editorial work and all the layout, printing, and circulation operations take place there. The paper is entered as second-class mail at the Somerville post office, which serves Bridgewater Township. The Plainfield office remains, but it is staffed by only seven or eight employees concerned with local advertising and news coverage. Preliminary typing and editorial work are done in the office, but both advertising and news copy are sent to Bridgewater Township for final handling. Similar local offices are maintained in several other communities, but they are much smaller, being staffed by only one or two employees.

---

[1] *39 U. S. C.* § 4352 requires that a publication be entered as second class mail "at the Post Office where the office of publication is maintained."

The total circulation of the paper is about 66,000 copies, of which 8,800, or almost one-seventh, are distributed in Plainfield.

The *Courier-News* argues that since it maintains a functioning "publication office" in Plainfield and since the first newspapers printed each day are put into circulation in Plainfield, the paper continues to be published in that city within the intendment of the publication statutes. The *Daily Journal*, the other daily newspaper circulating in Plainfield, argues that the *Courier-News* is no longer published in Plainfield, but is published outside Union County and thus is not eligible to be Plainfield's official newspaper.

The *Daily Journal* is published in Elizabeth, about 15 miles away at the eastern end of Union County. Until the removal of the *Courier-News*, the *Daily Journal's* circulation of about 67,000 copies was largely confined to eastern Union County and only a few copies were sold in Plainfield. In 1971, however, the *Daily Journal* entered upon a campaign to become a county-wide newspaper. It established a small branch office in Plainfield, staffed by three reporters to cover local news, and succeeded in raising its 1972 Plainfield circulation figure to 1,144.[2] The *Daily Journal* does not allege that it is published in Plainfield, but asserts that it is "published in the county and circulating in the municipality" within the intendment of the publication statutes, and is thus eligible to publish Plainfield's legal advertising in the event that no newspaper is published in Plainfield.

I

As a threshold issue we consider whether by moving its headquarters the *Courier-News* has forfeited its status as a "legal newspaper," that is, one generally qualified to print

---

[2]There is some indication in the testimony that this figure may include sample copies and copies returned unsold from newsstands rather than representing paid circulation.

the legal notices required of public bodies. While the issue is now moot, we discuss it for the purpose of elucidating the distinction between qualification as a legal newspaper, which is governed by the provisions of Title 35 (Legal Advertisements), and eligibility to publish the legal notices of a particular municipality, which is governed for the most part by the requirements set forth in various sections of Titles 40 and 40A (Municipalities and Counties).

At the time of removal of the *Courier-News,* the qualifications of a legal newspaper were enumerated in *N. J. S. A.* 35:1–2.2, set forth in pertinent part below:

Whenever, by law, it is required that there be published by printing and publishing in a newspaper or newspapers ordinances, resolutions or notices or advertisements . . . by any county, city or other municipality or municipal corporation, . . . such newspaper or newspapers must . . . meet the following qualifications, namely: said newspaper or newspapers shall be entirely printed in the English language, shall be printed and published within the State of New Jersey, shall be a newspaper of general paid circulation possessing an average news content of not less than 35%, *shall have been published continuously in the municipality where its publication office is situate for not less than 2 years* and shall have been entered for 2 years as second-class mail matter under the postal laws and regulations of the United States . . . [Emphasis added]

The intent of the Legislature is self-evident: to ensure that any newspapers carrying legal advertisements will be ones that are read and understood by a cross-section of the community, and that have "stability and continuous existence in the municipalities where their publication offices are maintained." *In re Bond Printing Co., Inc.,* 135 *N. J. L.* 478, 480 (E. & A. 1947). It is not disputed that the *Courier-News* is qualified in all respects except as to the requirement emphasized in the citation.[3] The paper's position is that it has continuously maintained its publication office in Plainfield and has continued to be published there, so

---

[3] Uncontradicted testimony adduced at trial was to the effect that the news content of the paper averaged 42%.

that it meets this requirement as well. For this proposition it relies heavily on *Hunterdon County Democrat v. Recorder Publishing Co.,* 117 *N. J. Super.* 552 (Ch. Div. 1971).

The facts of *Hunterdon County Democrat* were similar in many respects to those of the present case. The *Hunterdon Review,* a weekly newspaper, had been printed and published in Whitehouse Station (Readington Township) for many years. In 1969 the newspaper was consolidated with another local weekly, the *High Bridge Gazette,* and the main printing, editorial and advertising offices were relocated in Clinton. The Whitehouse Station office remained open for limited editorial, advertising and circulation purposes, and the paper continued to be entered as second-class mail at the Whitehouse Station post office.

The *Hunterdon County Democrat,* a rival newspaper published in Flemington and circulating throughout Hunterdon County, sought a declaratory judgment that the *Hunterdon Review,* by virtue of its move, no longer qualified under *N. J. S. A.* 35:1–2.2 for the publication of official advertising. The *Democrat* relied on *In re Bond Printing Co., Inc.,* 135 *N. J. L.* 478 (E. & A. 1947), in which a qualifying newspaper published in Red Bank had been purchased in 1946 by an Asbury Park firm; its entire publishing operation had been moved to Asbury Park and the name of the newspaper changed to the *Asbury Park Sun.* Rejecting the *Sun's* assertion that as successor to a qualified newspaper it automatically continued to be qualified to publish legal advertisements, the court found that the *Sun* had had its publication office in Asbury Park only since 1946 and had been published there only since that date, so that it failed to meet the two-year requirement of *N. J. S. A.* 35: 1–2.2.

The court in *Hunterdon County Democrat* carefully distinguished the fact situation and the policy considerations there present from those in *Bond Printing.* In *Bond,* the entire newspaper was bodily removed to another municipality. In *Hunterdon County Democrat,* however, a "publication

office" was retained at Whitehouse Station; in fact, since the paper continued to be entered there as second-class mail, Whitehouse Station remained the "office of publication" for purposes of the federal postal laws. Finding that "[t]here is nothing in the statute [*N. J. S. A.* 35:1–2.2] which requires editorial or business functions to be wholly performed at the publication office, or which limits a newspaper to one 'publication office.'" (117 *N. J. Super.* at 568–69) the court concluded that the Whitehouse Station office had not lost its status as a publication office of the *Hunterdon Review*. Additionally, the court found that the *Hunterdon Review* continued to be published at Whitehouse Station, relying on the formulation of *Montesano v. Liberty Warehouse Co.,* 121 *N. J. L.* 124, 125 (E. & A. 1938) that "the place of publication of a newspaper is where the paper is first put into circulation, where it is first issued to be delivered or sent, by mail or otherwise, to its subscribers." Since a truck dispatched from Whitehouse Station to the printing plant picked up the whole issue each week, and a substantial number of copies were distributed in Whitehouse Station, the court held that a liberal reading of *N. J. S. A.* 35:1–2.2 so as to effectuate the legislative intendment required the finding that Whitehouse Station remained a place of publication.

■ Although there are strong implications in the *Hunterdon County Democrat* opinion that a newspaper may have more than one publication office and also may be published in more than one place,[4] such a conclusion was not neces-

[4]The opinion, paying scrupulous attention to the statutory requirement that a newspaper "shall have been published continuously in the municipality where its publication office is situate for not less than two years," gave independent consideration to whether the paper was *published* in Whitehouse Station and whether it maintained a *publication office* there. 117 *N. J. Super.* at 567–69. We cannot agree that the statute imposes two separate requirements both of which a newspaper must meet if it is to qualify under *N. J.*

sary for the decision, given the posture in which the case was presented to the court. It is not clear what the result would have been if, for whatever reason, the *Hunterdon Review* had asserted that it was also published in Clinton. Indeed, the court expressly disclaimed any consideration of the issue of whether the *Hunterdon Review* was eligible for designation by any particular municipality as an official newspaper pursuant to *N. J. S. A.* 40:53–1, limiting its consideration to the Review's statutory qualifications as a legal newspaper. 117 *N. J. Super.* at 558–59.

■ ■ For reasons that will be developed later in this opinion, we find it impossible to agree with the position (at least under ordinary circumstances) that a newspaper can have more than one place of publication. While we see no reason to disagree with the holding in *Hunterdon County Democrat,* we do expressly disapprove any language in the opinion suggesting there may be more than one place of publication. Since there can be no question that the *Courier-News,* after moving to Bridgewater Township, maintained its

---

*S. A.* 35:1–2.2. It seems to us impossible that a newspaper can maintain a "publication office" (as distinguished from a branch office or an advertising office) in a place where the newspaper is not published, or that it can be published in a place where it has no publication office.

The original statute required merely that a newspaper, to qualify, should have been published continuously for not less than one year (*L.* 1936, *c.* 208, § 1, p. 512). The present language was added in 1941, evidently as part of an attempt at tighter control on newspapers eligible to publish official notices (*L.* 1941, *c.* 409, § 2, p. 1053; see also *L.* 1941, *c.* 147, § 2, p. 490). We consider that its purpose was merely to require that a newspaper should have been published in the same place for at least two years; that is, to assure that a qualified newspaper would be not a fly-by-night, but one firmly established in some community. Cf. *In re Bond Printing Co.,* *supra.* The later amendment granting a two-year "grace period" to previously qualified newspapers that move their publication offices (see pp. 181–182, *infra*), would appear to bear out this view of the legislative intent.

publication office there and was published there,[5] it follows that as of the date of the move (March 27, 1972) the paper could no longer meet the two-year publication requirement of *N. J. S. A.* 35:1–2.2 and had thus temporarily forfeited its status as a legal newspaper.

As we noted earlier, however, the issue has become moot. First, even before this case went to trial on February 19, 1974, the Legislature had passed an amendment to *N. J. S. A.* 35:1–2.2, as follows:

In the event any newspaper which shall have been qualified to publish legal advertisements shall move its publication office to any municipality in the same county or in an adjacent county of this State and which shall otherwise continue to meet the qualifications of this section, it shall continue to be qualified to publish legal advertisements which it was qualified to publish prior to moving said publication office for a period of 2 years after the date of the moving of its publication office.

The *Courier-News* thus became a beneficiary of a two-year "grace period" after its move, during which it remained qualified as a legal newspaper and continued eligible to publish Plainfield's official notices.

Second, after the *Courier-News* had been established in Bridgewater Township for two years and the grace period had expired, it had been publishing in the municipality where its publication office was situated (i. e., Bridgewater

[5]Although the *Courier-News* does not discuss the matter in its brief, we consider it doubtful that it would wish to assert that it was published in Plainfield only, and not in Bridgewater. Even if it did make such an assertion, we would be unable to uphold it. Not only is the great bulk of the newspaper's editorial, production, advertising, and circulation work performed in Bridgewater Township, but the paper canceled its entry as second-class mail at the Plainfield post office and applied for the equivalent status at the Somerville post office (which serves Bridgewater Township). Furthermore, we note from the transcript and Judge Halpern's opinion that the *Courier-News* now publishes the legal advertisements for a number of Somerset County municipalities, including Bridgewater Township itself.

Township) for the required two years and thus qualified as a legal newspaper under *N. J. S. A.* 35:1–2.2. It seems clear, indeed, that the Legislature's intent in passing the amendment was to preserve for a newspaper that moved its publication office its qualification as a legal newspaper during the two-year period before it qualified in its new location. In any event, there is no doubt that the *Courier-News* at present qualifies as a legal newspaper. We pass then to the second issue in the case: whether the *Courier-News* is eligible to publish the legal advertising of the City of Plainfield.

## II

The specific statutory requirements for newspapers in which official notices may be published take a number of different forms; some representative ones are set forth in the addendum to this opinion. Notwithstanding their variety, they have the same general tenor and clearly seek to achieve the same end: wide dissemination of notice throughout the municipality affected, so that citizens and interested parties may have an opportunity to become informed and to be heard. *Reisdorf v. Borough of Mountainside,* 114 *N. J. Super.* 562, 573 (Law Div. 1971); *Masnick v. Mayor & Council of Cedar Grove Township,* 99 *N. J. Super.* 436, 439 (Law Div. 1968); *Bruno v. Borough of Shrewsbury,* 2 *N. J. Super.* 550, 554 (Law Div. 1949). In concluding that the *Courier-News,* which continues to have the largest circulation in Plainfield and the closest local ties, remains eligible to publish the city's official notices, the courts below gave due attention to this clear intent of the Legislature. In their endeavor to fulfill the legislative intent in these particular circumstances, however, they have effected a considerable distortion of the specific language of the publication statutes.

The ultimate, underlying issue in the case is whether the *Courier-News* is at present "published" in Plainfield. The fundamental meaning of the word is "to declare publicly, make generally known" (Webster's Third Interna-

tional Dictionary) ; but the precise definition, of course, depends on the context in which the word is used. Not only do interpretations from the law of copyright, libel, or wills offer little assistance, but many of the earlier cases, which are concerned with whether "publish" can be distinguished from "print," have only limited applicability to the case at hand. The latter distinction has been clearly expressed in *Wolfe County Liquor Dispensary Association v. Ingram,* 272 *Ky.* 38, 113 *S. W.* 2d 839, 842 (1938) ("A book may be printed without being published. It is published only when it is offered for sale or put in general circulation") ; *see also State v. Briwa,* 198 *La.* 970, 5 *So.* 2d 304, 308 (1941) ; *Addison v. Town of Amite City,* 161 *So.* 364 (La. App. 1935) ; *In re Gainsway,* 66 *Misc.* 521, 123 *N. Y. S.* 966 (Sup. Ct. 1910). In any case, it is settled in New Jersey that a newspaper need not be regarded as published at the place where it is printed. *Schultz v. Board of Education of Wanaque,* 105 *N. J. Super.* 165 (App. Div. 1969) ; *Wildwood Publishing Company v. Wildwood,* 35 *N. J. Super.* 543 (Law Div. 1955) ; *see also N. J. S. A.* 35:1–2.2a, set forth in the addendum to this opinion. It is less simple, however, to arrive at an affirmative definition of "publish" that permits ready identification of a newspaper's place of publication.

Mr. Justice Field, in *Leroy v. Jamison,* 15 *Fed. Cas.* p. 373 (No. 8,271) (C.C.D. Cal. 1875), confronted this problem in connection with a Mexican grant of land in Santa Barbara County, California. A survey of this land, preliminary to issuing a patent, was required by statute to be published "in a paper published nearest the land." The survey was in fact published in the *Santa Barbara Gazette,* which was printed in San Francisco, several hundred miles north, and sent immediately to Santa Barbara for distribution there. Finding publication to have been insufficient, the opinion stated:

It was not alleged . . . that the entire issue was sent to Santa Barbara, though intended principally for circulation there. . . . The statute says that the notice must be published in a paper where the place of its publication is nearest the land, not where the place of its distribution is nearest. In one sense, a paper is published in every place where it is circulated, or its contents are made known. But it is not in that general sense that the language, "place of publication," in the statute is used. That language refers to the particular place where the paper is first issued, that is, given to the public for circulation. [15 *Fed. Cas.* at 380]

This analysis was applied by Mr. Justice Holmes, writing for the Supreme Judicial Court of Massachusetts in *Rose v. Fall River Five Cents Savings Bank, 165 Mass. 273, 43 N. E.* 93 (1896). A foreclosure statute required a notice of sale to be published in a newspaper, if such existed, published in the town where the mortgaged premises were located. The premises were in Dighton; the notice was published in the *Dighton Rock,* which was one of fifteen local newspapers, of identical content but with different mastheads, printed in Fall River and entered there as second-class mail. A small office, staffed by an agent, was maintained by the *Dighton Rock* in Dighton. Nevertheless, the court found that the newspaper was not published in Dighton, reasoning as follows:

Assuming that papers printed from the same type, with or without different names, might be published in different towns, within the meaning of the statute, in this instance all the 15 heads of the Hydra had their homes in Fall River. The word "published" is used in the statute not quite in the same sense in which it might be used in libel, but refers to the home office of the paper. There was but one place of management, and the paper was given to the world from there, not only under its other names, but as the Dighton Rock, so far as it had regular subscribers.

[43 *N. E.* at 93–94]

Similarly, the analysis of *Leroy* and *Rose* was applied in *Village of Tonawanda v. Price,* 171 *N. Y.* 415, 64 *N. E.* 191 (1902) to conclude that the *Tonawanda Herald,* which had moved to North Tonawanda, was no longer published in Tonawanda. The news items were datelined from both

places, but "the newspaper was completely prepared for distribution in North Tonawanda" (64 *N. E.* at 192).

This line of cases was followed by the New Jersey Court of Errors and Appeals in *Montesano v. Liberty Warehouse Co.,* 121 *N. J. L.* 124 (E. & A. 1938). The Uniform Warehouse Receipts Law required that a notice of sale appear "in a newspaper published in the place where such sale is to be held." The warehouse was in Union City and it was there that the sale was to take place. The advertisement of the sale appeared in a paper which was printed in Hoboken and had its main office there. Although the paper had a small Union City branch office, the court concluded that it was not published there, defining the place of publication to be "where the paper is first put into circulation, where it is first issued to be delivered or sent, by mail or otherwise, to its subscribers" (121 *N. J. L.* at 125). This definition was applied in *Wildwood Publishing Company v. Wildwood,* 35 *N. J. Super.* 543 (Law Div. 1955) and *Schultz v. Board of Education of Wanaque,* 105 *N. J. Super.* 165 (App. Div. 1969), both *supra,* two very similar cases in which newspapers were held to be published in municipalities whose names appeared on their mastheads, in which they maintained editorial offices, and where they received correspondence and were entered as second-class mail.

These and other prior cases were extensively reviewed and relied on by the court in *Hunterdon County Democrat v. Recorder Publishing Co., supra,* 117 *N. J. Super.* at 563–67, for its conclusion that defendant newspaper continued to be published in Whitehouse Station after its printing plant and main office were moved to Clinton. The court encountered some difficulty with the formulation of *Montesano, supra,* that the place of publication is "where the paper is *first* put into circulation, where it is *first* issued to be delivered . . . to its subscribers" (117 *N. J. Super.* at 570; emphasis added). Since the paper's delivery trucks were dispatched from Whitehouse Station to the printing plant in Clinton and dropped off bundled newspapers at various

Hunterdon County destinations on their way back to White-house Station, the court reasoned that a literal compliance with the *Montesano* rule would compel the conclusion that the newspaper was published in Oldwick, the first munici-pality to which newspapers were delivered. Interpreting the term "publish" so as to effectuate the legislative intent, how-ever, the court concluded that a sensible construction of the statute under consideration (*N. J. S. A.* 35:1–2.2) led to the conclusion that the newspaper was published in White-house Station (117 *N. J. Super.* at 570–73). The same formulation is relied upon by the *Courier-News* in the present case, which gives as one of its reasons for asserting that it is published in Plainfield the fact that the first news-papers printed each day are dispatched to Plainfield and placed on sale there before they are available elsewhere.

A review of the prior cases convinces us that before *Hun-terdon County Democrat,* it was taken for granted that a newspaper had only one place of publication, its "home of-fice," in the words of Mr. Justice Holmes. While there is language in *Hunterdon County Democrat* implying that a newspaper may be published in more than one place, this conclusion, as we have seen, was not necessary to the de-cision: the court was asked only to decide whether the newspaper was published in Whitehouse Station, not whether it was also published in Clinton.[6]

In our view, the characterization of a place of pub-lication as the place from which "the paper [is] given to the world" (*Rose v. Fall River Five Cents Savings Bank, supra,* 43 *N. E.* at 94), or at which it is "completely pre-pared for distribution" (*Village of Tonawanda v. Price, supra,* 64 *N. E.* at 192) is as accurate a definition of this

---

[6]We cannot agree with the Appellate Division majority in the present case that the Legislature "has apparently acquiesced in the holding" of *Hunterdon County Democrat* that a newspaper may have more than one place of publication. As we have seen, this issue was not before the court in that case.

elusive concept as it is possible to attain. Such a definition is essentially equivalent to that in *Montesano v. Liberty Warehouse Co., supra,* (the place of publication is "where the paper is first put into circulation, where it is first issued to be delivered or sent, by mail or otherwise, to its subscribers," 121 *N. J. L.* at 125), if, as we think necessary, the term "first" is taken to refer to the *first step* in the process of putting the paper into circulation, rather than, as was assumed in *Hunterdon County Democrat* and the lower courts in the present case, the *first moment* at which copies of the paper are actually received by the public. Under ordinary circumstances, such a definition can apply to only one place. While we do not regard it as determinative, support is lent to this conclusion by the provisions of 39 *U. S. C.* § 4352 relating to second-class mail permits which were unquestionably drafted under the assumption that a newspaper, although perhaps having more than one such permit, could have but one office of publication.[7]

Applying this definition to the present case clearly leads to the conclusion that the one place of publication of the *Courier-News* is Bridgewater Township. All final editing, printing, correction of printed proofs, assembly, bundling, truck delivery, and mailing take place there; it is unquestionably the "home office," the place from which the paper is "given to the world."[8] We are not prepared to say that a newspaper could never be published in more than

---

[7] The equivalence of "place of publication" and "office of publication" has been considered in note 4, *supra.*

[8] This conclusion does not, as might at first be imagined, represent a reversion to the older philosophy that the place of publication is always the place at which a paper is printed. It is entirely possible for the physical process of printing to take place at some distance from the location where the editing, assembly, and mailing functions are carried out. Indeed, printing itself is not a unitary process, involving typically composition, photography, makeup, and press work, which may be performed at different locations. See *Bayer v. Hoboken,* 44 *N. J. L.* 131 (Sup. Ct. 1882), aff'd 45 *N. J. L.* 185 (E. & A. 1883).

one place. A paper of national circulation, with editorial offices on both east and west coasts at which different "editions" were prepared and issued to subscribers, might well qualify for such a description. But the maintenance of what is essentially a small branch office, like the one operated by the *Courier-News* in Plainfield, is not enough to constitute "publication" there. If it were, as Judge Halpern pointed out in his dissent, a large metropolitan newspaper might open branch offices in all the communities in which it circulates and become eligible, without more, to publish their legal advertisements. We are convinced that such a result is directly in conflict with the Legislature's evident wish to have legal advertisements published in local newspapers with community ties. The lower courts, in finding that the *Courier-News* is published in Plainfield, have in essence read the word "published" out of the relevant statutes.

For the foregoing reasons the judgments of the Appellate Division and of the trial court are reversed and judgment is entered declaring that the Plainfield *Courier-News* does not now publish within the City of Plainfield. As a result, the *Daily Journal,* which is published in Union County, is qualified to serve as Plainfield's official newspaper.

## ADDENDUM

The following formulations are representative of those found in the portions of Title 40 and Title 40A, *N. J. S. A.,* dealing with municipalities. Similar requirements are stated for counties, for school districts (Title 18A) and for various state agencies. Not all the statutes, of course, are applicable to all municipalities. The list is not intended to be exhaustive.

CIRCULATING
"a newspaper of general circulation in the municipality (ies)"
*N. J. S. A.*
40:43–66.13    (municipal consolidation) ;
40:55–21.5    (hearing on declaration of blighted area)
"a newspaper of general circulation published in this State and cir-

culating within the territory included within or served by the contracting unit"

*N. J. S. A.* 40A–11–23 (advertisements for competitive bidding) "newspaper(s) circulating in [the] municipality (water district, borough, township)"

*N. J. S. A.*

| | |
|---|---|
| 40:55–25 | (building line maps) ; |
| 40:56–25 | (assessment for improvements) ; |
| 40:56–30 | (report of assessors for improvement) ; |

*N. J. S. A.*

| | |
|---|---|
| 40:61–8 | (public park referendum) ; |
| 40:62–4 | (sale or lease of public utility) ; |
| 40:62–105.18 | (election of water commissioners) ; |
| 40:63–33 | (intention to establish sewerage district) ; |
| 40:63–57 | (notice to unknown property owner) ; |
| 40:64–9 | (shade tree commission) ; |
| 40:65–4 | (sidewalk improvements) ; |
| 40:69A–202 | (notice of ward boundaries) ; |
| 40:75–30 | (recall of commissioners) ; |
| 40:84–6 | (elections, council-manager form) ; |
| 40:87–22 | (boroughs: elections) ; |
| 40:145–24 | (townships: abolition of board of tax assessors) ; |
| 40:156A–18 | (townships: ward lines). |

PUBLISHED (PRINTED)

"a newspaper published in the municipality, or if there be no such newspaper, then in a newspaper published in the county and circulating in the municipality"

*N. J. S. A.*

| | |
|---|---|
| 40:49–9 | (election after protest of improvement ordinance) ; |
| 40:49–27 | (ordinance authorizing incurring of indebtedness) ; |
| 40:62–93 | (municipal water utility referendum). |

"one or more newspapers published in the village, or if there be no such newspaper, then in two published at the county seat of the county in which the village is situate"

*N. J. S. A.* 40:161–2 (villages: choice of election date)

"two newspapers published in such city, or, in the absence of one or both such newspapers so published, then in one or two (as the case may be) newspapers published in the county in which such city is situate"

*N. J. S. A.* 40:179–108,111 (cities: pier construction)

"a newspaper published in the municipality, or if there be no such newspaper, then in a newspaper having general circulation in such municipality"

*N. J. S. A.* 40:69A–171 (Faulkner Act: recall elections)

"a newspaper printed and published in the township, if there be one, and if not then in one printed in the county in which said township is located and circulating in said township"

*N. J. S. A.* 40:153–17 (road district assessment)
"a newspaper printed and published in the township, or if there be no such newspaper then in one printed and published in the county and circulat[ed] in the township"
*N. J. S. A.* 40:153–5 (meetings of road commissioners)
"a newspaper printed and published in the municipality, and if there be no such newspaper then in a newspaper circulated therein"
*N. J. S. A.* 40:71–2 (elections, commission form)
"at least one newspaper printed and published in the city"
*N. J. S. A.* 40:187–1 (financial statements)
"[a] newspaper which has been so published in such municipality for at least six months last past, and if there be no such newspaper then in a newspaper having a general circulation therein"
*N. J. S. A.* 40:80–2 (adoption of council-manager form of government)
"at least two newspapers published in the county in which the municipality is situated, and if a paper is published in the municipality it shall be one of those so selected"
*N. J. S. A.* 40:57–3 (intention to reclaim underwater lands)
PUBLISHED (PRINTED) OR CIRCULATING
"newspapers printed or circulating in the municipality"
*N. J. S. A.*
40:54–3          (library referendum) ;
40:60–33          (extinction of public rights in land)
"newspaper(s) published or circulating in the municipality (sewerage district, port district)
*N. J. S. A.*
40:14A–14          (sewerage authority bonds) ;
40:14B–28          (municipal water and sewerage authority) ;
40:45–3          (special elections) ;
40:63–45          (sewage plant bids) ;
40:68A–47          (Port Authority bonds) ;
40:69A–194          (Faulkner Act; election on ordinances)
PUBLISHED AND CIRCULATING
"newspaper published and circulating in the municipality [and if there is no such paper then] in a newspaper published (printed) in the county and circulating in the municipality"
*N. J. S. A.*
40:92–2          (passage of ordinances) ;
40:49–18          (street improvement ordinances) ;
40:53–2          (general publication procedure, exclusive of cities) ;
40A:2–19          (local bond ordinances) ;
40A:4–6          (local budgets)
"two newspapers published [and circulating] in the county in which such city is situate"
*N. J. S. A.* 40:179–11 (lease of wharves)
"newspaper which has been published and circulated, for at least one year past, in such municipality [and if there is no such paper then] in at least one newspaper published, for at least one year past,

in a municipality located in the same county in which the municipality holding the election is located and having a general circulation in such last-mentioned municipality."
N. J. S. A. 40:76–17 (abandonment of commission form)
OFFICIAL NEWSPAPER
"publication in the official (news)paper(s) (of the town)"
N. J. S. A.
40:128–3      (street-sprinkling ordinance) ;
40:128–4      (assessment for street sprinkling) ;
40:171–26    (cities; passage of ordinances)
"the official newspaper of the municipality [and if there is no such newspaper then] in a newspaper of general circulation in the municipality"
N. J. S. A.
40:55–1.7      (planning board hearings)
40:55–1.36    (official map) ;
40:55–34      (zoning ordinance)
"the official newspaper [of the municipality], or if there be no official newspaper, then in at least two newspapers published in the county and circulating therein"
N. J. S. A. 40:123–3 (incorporation)
"the official newspaper of the local unit, if there be one, or if there be none, in a newspaper published in the local unit. If there is no newspaper published within the local unit, it shall be published in a newspaper having a general circulation in the local unit."
N. J. S. A. 40A:5–7 (local audit)

It should be noted that the requirement that a newspaper be printed in a certain locality, present in a few of these statutes, has been superseded by the passage of N. J. S. A. 35:1–2.2a in 1968. This statute provides as follows:

Notwithstanding any other provision of law whenever, by law, it is required that there be published by printing and publishing in a newspaper, which meets the qualifications set forth in Revised Statutes 35:1–2.2, ordinances, resolutions or notices or advertisements of any sort, kind or character by any county, or by any city or other municipality or municipal corporation, or by any municipal board or official board, or body, or office, or officials, or by any person or corporation of such county, such notice or advertisement may be published in a newspaper published in such county or municipality, as may be required by the statute prescribing the method of publication, except that there shall hereafter be no requirement that the newspaper be printed in any such county or municipality provided that the said newspaper is printed in the State of New Jersey.

It should also be noted that the City of Plainfield sought a declaratory judgment particularly as to the *Courier-News* eligibility under *N. J. S. A.* 40:53–2. This statute by its terms is not applicable to Plainfield, since it provides a general procedure for publication of official notices but specifically excludes cities from its provisions. Since many of the statutes cited above would be applicable to Plainfield in certain circumstances, however, we consider the matter as if Plainfield had sought a declaratory judgment of broader scope.

SULLIVAN, PASHMAN and SCHREIBER, JJ., dissenting. We would affirm substantially for the reasons expressed in the majority opinion of the Appellate Division.

*For reversal*—Chief Justice HUGHES, Justices MOUNTAIN and CLIFFORD and Judge CONFORD—4.

*For affirmance*—Justices SULLIVAN, PASHMAN and SCHREIBER—3.