**Raymond R. BEAUFORT et al.**

v.

**WARWICK CREDIT UNION et al.**

**No. 79–160–Appeal.**

Supreme Court of Rhode Island.

Dec. 15, 1981.

Thomas L. McDonald, Providence, for plaintiffs.

Hinckley, Allen, Salisbury & Parsons, Robert W. Lovegreen, Providence, Leo X. McCusker, Warwick, for defendants.

## OPINION

KELLEHER, Justice.

This is a Superior Court civil action in which the plaintiffs, Raymond R. Beaufort, Louise B. Beaufort, and R. A. Beaufort & Sons, Inc., seek to set aside the mortgage foreclosure on two parcels of real estate located in the city of Warwick. The defendants are the mortgagee, Warwick Credit Union, and Charles R. Blackmar and his wife, Marie. The Blackmars purchased one of the parcels from the credit union. (Hereinafter we shall refer to the plaintiffs as Beaufort; in referring to the defendants, we shall restrict ourselves to the defendant mortgagee, hereafter the credit union. As will be seen, there is no necessity that we make any further reference to the Blackmars.)

The controversy was resolved in the Superior Court by way of cross motions for summary judgment. Beaufort's motion is based upon his claim that the credit union failed to comply with the statutory requirements regarding notice of a foreclosure of a real estate mortgage containing a power of sale. The credit union in its motion insists that in foreclosing the mortgages in ques-

tion, it had touched all the bases. The trial justice granted the credit union's motion and denied Beaufort's motion. We affirm.

The pertinent statutory mandates are to be found in G.L.1956 (1969 Reenactment) §§ 34–11–22 and 34–27–4. Section 34–11–22 in its pertinent portions authorizes the sale of real estate by mortgagee at public auction upon a breach by the mortgagor after

"first giving notice at [sic] the time and place of sale by publishing the same at least once each week for three (3) successive weeks in a public newspaper published daily in the city in which the mortgaged premises are situated; and if there be no public newspaper published daily in the city in which the mortgaged premises are situated, * * * then * * * (6) if the mortgaged premises are situated in any of the counties of Bristol, Kent or Washington, * * * in some public newspaper published daily in the county in which the mortgaged premises are situated or in a public newspaper published daily in the city of Providence * * *."

Section 34–27–4 further provides that whenever real estate is to be sold pursuant to a power of sale contained in a mortgage, the first publication of notice must be at least twenty-one days prior to the date of sale, with the first day of the publication being part of the computation.

One of the two parcels in question is located in Warwick at 145 Long Street. Notice of the foreclosure sale scheduled for August 3, 1976, was given in the Pawtuxet Valley Daily Times (the Times) on July 12, 19, 26, and August 2, 1976. The second parcel is also situated in Warwick at 21 Blake Street. The notice regarding a foreclosure sale scheduled for August 17, 1976, at this address was published in the Times on July 26, August 2, 10, and 16, 1976.

Beaufort, in seeking to set aside the foreclosure sales, contends that (1) the Times neither is a "daily" newspaper nor is it "published" within the city of Warwick and (2) the notice that was filed did not satisfy the statutory command for the three-week interval set forth in § 34–27–4.

■ Beaufort obviously believes that a "daily" newspaper is one that is circulated to the reader every day of the week. An affidavit executed by the Times's circulation manager states that the paper is circulated six days a week, excluding Sundays and holidays. We would note that when this issue has arisen, one court has pointed out that ordinarily the term "daily newspaper," when used in the context of statutes requiring the giving of legal notice, is used in contradistinction to such terms as "weekly newspaper" or "semiweekly newspaper," *Wilson & Co. v. Petzold*, 116 Ky. 873, 76 S.W. 1093 (1903); other courts have held that in its popular sense the term "daily newspaper" can refer to a paper that is published six days a week [1] or to a paper that is published every day except Saturdays, Sundays, and legal holidays [2] or to a paper that is published five days a week. [3] We feel no hesitancy whatsoever in subscribing to the judicial sentiments expressed above. We have every confidence that the Times's readers, if asked, would certainly view that publication as a daily newspaper despite the fact that the paper boy/girl does not deliver on Sundays or on such holidays as January 1, July 4, Thanksgiving Day, or Christmas Day.

Beaufort next argues that the Times was not "published" in the city of Warwick as required by the mandate found in § 34–11–22 because the publication took place in the town of West Warwick. In supporting this position, Beaufort first points to the January 13, 1978 affidavit in which the Times's circulation manager makes it clear that the Times is printed and first put into circulation in the town of West Warwick, a municipality neighboring the city of Warwick. Beaufort, relying on an affidavit furnished by the Journal's circulation manager, claims that the only newspaper published in Warwick is the Providence Journal. In his affidavit, the manager indicates that on every weekday six different editions of the Providence Journal are printed in the city of Providence. One of the six editions is entitled "West Bay Edition." The Journal's West Bay Edition is delivered by truck from Providence to three of Rhode Island's municipalities, Cranston, Warwick, and East Greenwich. The manager also avers that the West Bay Edition is "first circulated and distributed to the public in the cities of Cranston and Warwick and the town of East Greenwich."

On the other hand, the credit union argues in the alternative. It first claims that the Times is published in Warwick, but if this is not the case, then the Times takes the position that there is no daily paper "published" in Warwick, and thus that portion of § 34–11–22 which allows a notice of a foreclosure sale to be published in any daily newspaper published in Kent County comes into play.

A word may have a myriad of meanings depending upon the context in which the word is found. However, Webster's Third New International Dictionary describes the fundamental meaning of the word "publish" as "to declare publicly, make generally known." Many courts have considered whether "publish" is synonymous with "print." However, the distinction between these two terms was made quite clear in *Wolfe County Liquor Dispensary Ass'n v. Ingram*, 272 Ky. 38, 43, 113 S.W.2d 839, 842 (1938), where the court noted: "A book may be printed without being published. It is published only when it is offered for sale or put in general circulation." [Citation omitted.]

Here, our task is to ascertain the legislative intent that gave rise to the enactment of § 34–11–22 and, if possible, to effectuate that intent. *Gott v. Norberg*, R.I., 417 A.2d 1352 (1980); *Vaudreuil v. Nelson Engineering and Construction Co.*, R.I., 399 A.2d 1220 (1979). An examination of § 34–11–22

---

1. *State ex rel. Item Co. v. O'Neil*, 198 La. 639, 4 So.2d 633 (1941) (no Sunday paper).

2. *State v. City of San Antonio*, 259 S.W.2d 248 (Tex.Civ.App.1953) (no paper on Saturdays, Sundays, and holidays).

3. *Hansen v. City of Havre*, 112 Mont. 207, 114 P.2d 1053 (1941) (paper published daily during the period beginning on Tuesday and ending on Saturday).

reveals a clear intent on the part of the General Assembly that notice of a mortgage foreclosure sale was to be given thorough local dissemination by having the notice published in a daily newspaper having ties with the municipality in which the real estate was located, and if such a geographical location was not possible, then the notice was to be published in a paper in the county in which the property was situated. Thus, the Legislature was attempting to ensure that any published notice required by statute come to the attention of as many readers in the locality of the property concerned as possible.

The intent to which we have just alluded might have been best explained by Justice Oliver Wendell Holmes when, in construing a Massachusetts mortgage foreclosure statute that is similar to our § 34–11–22, he defined the place of publication as "the home office of the paper," "the one place of management" where "the paper was given to the world." *Rose v. Fall River Five Cents Savings Bank*, 165 Mass. 273, 275, 43 N.E. 93, 93–94 (1896). Similarly, the home-office concept was adopted in *State v. Bass*, 97 Me. 484, 490, 54 A. 1113, 1115 (1903), where the court ruled that the place of publication of a newspaper is "where it is first issued to be delivered or sent by mail or otherwise to its subscribers."

Later, the New Jersey Supreme Court in *City of Plainfield v. Courier-News*, 72 N.J. 171, 187, 369 A.2d 513, 521 (1976), in applying a gloss to the thoughts expressed by Justice Holmes, emphasized that a so-called publication location is that place where the paper is given to the world and went on to say that this giving occurs at the place where "[a]ll final editing, printing, correction of printed proofs, assembly, bundling, truck delivery, and mailing take place * *." The New Jersey Supreme Court explained that the notice is first given to the world at the moment when the first step required to place the paper in circulation has been taken rather than the first moment when the public actually receives a copy of the paper. In other words, the place of publication is, as Holmes said, the paper's home office. It was further emphasized in the *Courier-*

*News* case that the place of publication can be an "elusive concept." The court also alluded to the possibility that the requisite publication could occur in more than one place—for instance, when the paper in question is one of national circulation.

The rationale expressed by Mr. Justice Holmes and the New Jersey Supreme Court was recently restated in *Oklahoma Journal Publishing Co. v. City of Oklahoma City*, 620 P.2d 452, 455 (Okla.App.1980). There the court rejected the plaintiff paper's contention that its newspaper was published in Oklahoma City because the paper maintained several distribution offices there. After acknowledging that "publishing" and "printing" are different concepts, the Oklahoma court ruled that the paper's place of publication was located in another municipality where "the paper's principal offices are located, * * * where its content is determined, * * * where it is edited, and that is the place from which the newspaper is disseminated."

■■■ When one applies the home-office concept to the litigation before us, it is obvious that neither the Times nor the Providence Journal's West Bay Edition is "published" within the city of Warwick. The Times's home office is in West Warwick, and the Journal's home office is in Providence. Consequently, the Kent-County-publication proviso of § 34–11–22 is triggered. Everyone concedes that the town of West Warwick is one of five municipalities that collectively make up Kent County. It follows from what we have said that the Times is indeed a daily newspaper "in the county in which the mortgaged premises are situated." Consequently, Beaufort's nonpublication defense must fail.

Beaufort's reliance on the provisions of § 34–27–4 is pertinent solely to the foreclosure sale of the Blake Street property. The statute requires that notice of the foreclosure sale be published in a public newspaper "at least once a week for three (3) successive weeks" before such sale. The statute also requires that the first publication shall be made at least twenty-one days before

the day of sale and that the day of the first publication may be employed in computing the twenty-one-day interval.

Beaufort, in seeking to invalidate the Blake Street foreclosure, directs our attention to *Quinn v. McDole*, 28 R.I. 327, 67 A. 327 (1907), where the issue was whether Quinn could convey to McDole good title to real estate that Quinn had acquired through a mortgage foreclosure sale. The joint brief filed by Quinn and McDole reveals that the mortgage in question was executed in 1868 and foreclosed in late March 1899. The mortgage contained a provision requiring "four weeks" notice of such sale in some newspaper published in Pawtucket or Providence. The notice was published every weekday but Sunday for three successive weeks and on Monday and Tuesday of the fourth week, with the sale taking place on the next day, Wednesday, March 29, 1899. There was a twenty-three-day interval between the publication of the first notice and the sale. The court, in rejecting Quinn and McDole's argument that the sale was valid, pointed out that the mortgage meant exactly what it said in saying "four weeks" notice of the foreclosure sale and that at least twenty-eight days had to elapse between the day of the first publication and the sale. Beaufort, in relying on *Quinn*, overlooks the fact that in 1907 the court was construing the foreclosure provision contained in the 1868 mortgage rather than some statutory demand. In fact, the once-a-week-for-three-successive-weeks language and the necessity for a twenty-one-day interval between the date of the first publication and the sale found in § 34–27–4 seems to be the direct result of the holding in *Quinn*. *See McKendall Land Co. v. Tudor Arms*, 54 R.I. 10, 168 A. 908 (1933).

Actually, the publication requirements of a notice sufficient to meet the demands of § 34–11–22 were determined eight years ago in *Sullivan v. Faria*, 112 R.I. 132, 136, 308 A.2d 473, 475 (1973), where we referred to the divergent judicial views that have been expressed whenever a statute calls for the publication of a legal notice in terms such as "for 3 weeks" or "once a week for 3 successive weeks." We observed in *Sullivan* that when a statute specifies the duration of notice, the notice must be published for and during the specified period, but when the sole reference in the statute is to the number of times the notice must be published, compliance is had when the notice is published according to the statutory schedule. In *Sullivan*, we construed the word "week" as it appeared in a statute requiring publication at least once a week for three successive weeks of a zoning board hearing as meaning a calendar week, that is, the seven-day period that begins on a Sunday and ends on the following Saturday. In adopting a calendar-week outlook, we noted that § 43–3–12 provides that whenever the words "month" and "year" are used in the General Laws, they shall be construed as meaning a calendar month and year; and in the interests of consistency we decided to construe the word "week" in the light of the intent specified in § 43–3–12. Thus, we ruled that the notice requirements of the statute were satisfied by the publication of the notice on one day during each of the three calendar weeks preceding the hearing. Compliance is had with such statutes as the one in *Sullivan* even though three full weeks do not elapse between the initial publication and the event publicized.

Beaufort argues vigorously and with a great deal of self-interest that we should construe the word "week" in the foreclosure statute as meaning the "statutory week," that is, any consecutive seven-day period. If we were to adopt Beaufort's view, the seven-day period as it relates to the Blake Street parcel would begin on Monday, July 26, 1976, and end on the following Sunday. The second consecutive notice duly appeared on the following Monday, August 2, but the three weeks' consecutiveness spelled out in the statute would be broken because the Times did not publish the third notice until Tuesday, August 10. Indeed, the notice could not have been published on Monday, August 9, because the second Monday in August in Rhode Island is a holiday officially designated as Victory Day, a time when Rhode Islanders may pause and re-

member such historical events as the August 1945 cessation of hostilities between the United States of America and the Japanese Empire as well as the end of World War II.

Although Beaufort's approach is ingenious, it is not victorious. We see no reasonable basis in construing the word "week" in the notice requirements of § 34–27–4 any differently from the meaning accorded it in *Sullivan*. Section 34–11–22 specifically sets forth the number of times the notice of sale must be given and then goes on to call for a twenty-one-day lapse between the day of the first notice and the date of sale. It is obvious that the credit union has complied with both aspects of the statute, i.e., the frequency of notice and the interval between the initial notice and the sale. Nothing more need be said in this regard.

Accordingly, Beaufort's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court for further proceedings.[4]

---

4. The record indicates that counterclaims against Beaufort were filed by both the credit union and the Blackmars. We considered this appeal only after compliance was had with the certificate requirements of Super.R.Civ.P. 54(b) that there was no reason to delay entry of judgment. We trust that all the matters referred to in the counterclaims will be resolved in due course.