117 N.J. Super. 219 (1971)
284 A.2d 355
ALFRED S. GAMRIN, ET AL., PLAINTIFFS-APPELLANTS,
v.
PALISADES NEWSPAPERS, INC., A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT, AND THE CITY OF ENGLEWOOD IN THE COUNTY OF BERGEN, A MUNICIPAL CORPORATION, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 12, 1971.
Decided November 30, 1971.
*220 Before Judges GOLDMANN, COLLESTER and MINTZ.
Mr. Donald P. Sharkey argued the cause for appellants (Mr. John B.M. Frohling, attorney).
Mr. Burton T. Cohen argued the cause for respondent (Mr. Walter Henry Jones, attorney).
The opinion of the court was delivered by GOLDMANN, P.J.A.D.
The issue to be determined on this appeal from a judgment in favor of defendant Palisades Newspapers, Inc. (Palisades) is the proper construction of N.J.S.A. 35:2-1  in particular, whether Palisades was correct in charging the City of Englewood for official advertisements on the basis of an agate rule measurement of the space occupied, or whether the newspaper should have charged on the basis of an agate line count.
Plaintiffs, ten citizens and taxpayers of Englewood, brought an action pursuant to N.J.S.A. 2A:49-1 to recover on behalf of the city overpayments alleged to have been made by it for official advertising in Palisades' Press-Journal, a newspaper circulating in Englewood, Bergen County; to enjoin further official advertising in that newspaper except in the manner and subject to the terms and conditions set forth in N.J.S.A. 35:2-1, and for related relief. Palisades' answer denied the essential allegations of the complaint and set up certain defenses. Englewood took *221 a neutral position in its answer, leaving plaintiffs to their proofs.
On the basis of the pleadings and depositions, supplemented by certain affidavits, plaintiffs moved for partial summary judgment adjudging that Palisades' manner of computing charges for official advertising was illegal and the charges thus computed excessive, and that plaintiffs were entitled to recover on behalf of the city overpayments already made. Palisades countered with a motion for summary judgment. The city took a position in support of plaintiffs. The trial judge ruled in plaintiffs' favor, reserving for future determination, following a plenary trial: (a) Press-Journal's net paid circulation at relevant times from September 1965 (when official advertising in the newspaper began) to date, and (b) the amount of excess charges plaintiffs were entitled to recover on behalf of the city.
Palisades appealed from the judgment. The city, considering its position the same as plaintiffs', appointed their attorney as special counsel to represent it as well. Counsel then filed a cross-appeal on behalf of plaintiffs and Englewood. Prior to argument Palisades' counsel moved for leave to supplement the record, whereupon this court remanded the matter to the trial court to enable Palisades to move for a revision of the decision under R.R. 4:55-2 (now R. 4:42-2) or to reopen the partial summary judgment under R.R. 4:62-2 (now R. 4:50-1). On remand the trial judge determined that a plenary hearing should be had as to all issues and thereupon vacated the partial summary judgment he had granted.
At the conclusion of the plenary hearing the same judge who had granted the partial summary judgment reversed his original holding and found in favor of Palisades on all issues. Following the entry of an accordant final judgment plaintiffs filed a new notice of appeal, the city having determined not to pursue the matter further. The previously filed notices of appeal and cross-appeal from the partial summary judgment were dismissed by stipulation.
*222 Beginning with publication in 1965 Palisades represented that the Press-Journal was authorized to publish official advertising as defined in N.J.S.A. 35:1-1, by reason of its meeting the qualifications set out in N.J.S.A. 35:1-2.2. It has at all times also represented that the average weekly net paid circulation of the newspaper was more than 5,000 and less than 10,000, and it was therefore entitled under N.J.S.A. 35:2-1 to charge 22¢ per insertion for official advertising "per agate line." (L. 1968, c. 134, enacted during the pendency of this action, increased the rate to 24¢ for newspapers having such circulation.) Englewood has since September 1965 placed numerous official advertisements in the Press-Journal and, until this litigation, paid Palisades the charges as computed by it.
N.J.S.A. 35:2-1, which sets the rates for official advertising, provides:
The price to be paid for publishing all official advertising as defined in section 35:1-1 of this Title in newspapers shall be as follows:
In newspapers published in the State of New Jersey having a bona fide net paid circulation of up to 2,500 copies, the rate shall be $0.16 per agate (or 5 1/2 point) line for each insertion; in the case of any newspaper having a bona fide net paid circulation of not less than 2,500 copies nor more than 5,000 copies, the rate shall be $0.20 per agate line for each insertion; and in the case of any newspaper having a bona fide net paid circulation of not less than 5,000 copies and not more than 10,000 copies, the rate shall be $0.22 per agate line per insertion; * * * but before any newspaper can charge the foregoing rates, the publisher or business manager of such newspaper must file with the properly authorized officer of every municipality, county or governing body, placing official advertising in such newspaper, an affidavit setting forth the average net paid circulation of such newspaper for the 12 months' period ending September 30 next preceding and the rate to be charged for official advertising, which in no case shall be in excess of, or below, the rates provided in the foregoing schedule.
The charge per agate or 5 1/2 point line shall be based on measurement of a line or not less than 10 ems in width, but date lines, paragraph endings, titles, signatures and similar short lines or lines that require special emphasis, such as the title of the notice, shall be computed as full lines where set to conform to the usual rules of composition.
*223 (The omitted statutory language fixes increased rates for various categories of papers with greater circulation.)
Plaintiffs' complaint alleges that Palisades has improperly construed and illegally applied the statutory language in that (a) it computes its charges by measuring the gross space occupied by official advertisements, using an agate ruler and charging 22¢ for every agate space occupied by the particular advertisement, rather than for actual lines of type; (b) although it charges the statutory rate for each agate space, the type actually used in setting the advertisements is larger than agate; (c) it imposes charges for space occupied by copy which is neither requested by the city nor required by the advertisement, and (d) it did not file with any officer of the City of Englewood any affidavit stating the average net paid circulation of the Press-Journal, or the rate to be charged for official advertisements, as required by N.J.S.A. 35:2-1.
The main issue posed on this appeal is the meaning of the term "agate (or 5 1/2 point) line" used in N.J.S.A. 35:2-1. Plaintiffs contend that the language means a line of print in agate or 5 1/2 point type. Palisades construes the phrase differently: an "agate (or 5 1/2 point) line" does not mean a line of agate type, but the space occupied by an agate line, to be measured vertically by an agate ruler. The trial judge agreed with the latter contention when he ruled in Palisades' favor.
Definitions are in order. An agate ruler is a ruler divided into agate lines, containing 14 agate lines to an inch, and is commonly used by newspapers in measuring the vertical space occupied by display ads. A point is a measurement of linear space equal to 1/72nd of an inch. Agate type, often referred to as 5 1/2-point type, is any style or design of type whose characters can be printed in a linear vertical space of 5 1/2 points; it has no relation to type width. (Although agate type is commonly referred to as 5 1/2-point type, it should be noted that 14 lines of 5 1/2-point type would total 77 points, and not the 72 points per inch occupied by 14 *224 agate lines.) Nonpareil type (a descriptive used in some of the statutes about to be mentioned) or 6-point type, is any style or design of type whose characters can be printed in a linear vertical space of 6 points. An em is a measure of column width, defined as the square of any given type body  the larger the type, the larger the em. A slug is a device in which characters are set, measured in points, the point of the slug determining the number of actual lines to an inch. There are, of course, many styles or designs of type.
Joseph H. Daniels, former president and director of Palisades, now deceased, testified on deposition that official advertisements in the Press-Journal were printed in 6-point type on a 6-point slug, since Palisades did not own any smaller type. The width of the lines of type has always been 10 ems or greater. In determining the fees to be charged for official advertising Palisades used an agate ruler to measure the number of agate lines in the advertisement, and then multiplied that number by 22¢. To set off the official advertisement, Palisades inserted a line of type reading "Public Notice" at the top of each advertisement, with line dividers above and below, and also inserted "Press-Journal" at the end. The Englewood City Clerk would send official advertisements to Palisades for publication in the Press-Journal. The instructions on the form supplied by the city dealt with such matters as when the notice should appear and the number of proofs of publication required.
The hearing on remand was concerned mainly with the presentation of exhibits and expert testimony.
Peter W. Jedrzejek, a typographer engaged in the sale of typography, testified for plaintiffs that some newspapers construed the statutory phrase "per agate (or 5 1/2 point) line" to mean a line of 5 1/2-point type, while others considered it as meaning the space occupied. In his judgment the statute required charges to be assessed on the number of actual lines of agate type.
Plaintiffs' next witness was Gregory Hewlett, a New Jersey newspaperman who had been a director and president *225 of the New Jersey Press Association. He stated that his newspaper printed official advertisements in 6-point type but counted the number of actual lines, as opposed to measuring by agate ruler, except in the case of a map or illustration, where the agate ruler was used (an exception also noted by Jedrzejek). Like the first witness he, too, conceded that there were variations throughout New Jersey in the manner of calculating charges, including the use of an agate ruler for measurement. With regard to the heading on official advertisements, Hewlett stated that the practice varied greatly, but he did not know whether newspapers which used the "Public Notice" heading charged for such inclusion. As to the insertion of the name of the newspaper at the end of the advertisement, he said his newspaper did so; it was an important factor in identifying the advertisement at a later date.
Plaintiffs' final witness was Earle H. Dubois, the classified advertising manager of the Bergen Record. He testified that the Record printed official advertisements in 5 1/2-point type on a 5-point slug, and that the charge made was by counting the number of lines. The agate ruler was used for measuring space occupied by illustrations and the like. Like the other two witnesses, he was aware of the many variations in charging for official advertisements.
Palisades presented as it first witness David M. Morton, an associate professor of graphic arts, who had done extensive work for weekly newspapers. He defined an "agate line" as a measure of space, one column wide and 1/14th of an inch deep. It did not mean a line of agate type. In his view, the proper way to charge under N.J.S.A. 35:2-1 was to measure the number of agate lines with an agate ruler.
David L. Cangi, Palisades' final expert witness and publisher of a number of small weekly newspapers in the Bergen-Hudson County area, testified that his newspapers published official advertisements in 6-point type and measured them with an agate ruler. As for the practice of inserting *226 "Public Notice" at the head of a particular advertisement, he said that some newspapers do so and charge for it, as did he on occasion. His newspapers also included and charged for the name of the newspaper inserted at the end of an official advertisement. It was Cangi's opinion that the use of the agate ruler as a basis of charging for official advertisements complied with N.J.S.A. 35:2-1.
In the course of his oral opinion at the conclusion of the plenary hearing the trial judge made certain findings of fact, the definitive one, as noted, being that the statutory language meant that the charge for official advertising was to be based upon vertical space measured by an agate ruler.
Whatever the testimony of the expert witnesses, conflicting as it was, our task is to construe the statutory language. To this end a review of the statutes which found their ultimate reflection in N.J.S.A. 35:2-1 is instructive.

I
Apparently the first general regulation of official advertising rates in New Jersey was L. 1857, c. 137, which provided that the rate for newspaper advertisements required by law "shall be forty cents per folio (one hundred words) for the first insertion and twenty cents per folio for each subsequent insertion after the first." The rate was increased by L. 1863, c. 92, but the "per folio" manner of computation remained unchanged.
A parallel statute, L. 1891, c. 223, fixed a "per line" rate in the case of official advertising by a county or municipality in daily newspapers published in cities of the first and second class, the rate being "ten cents per line for the first insertion and five cents per line for each subsequent insertion and no more * * *." In Daly v. Ely, 53 N.J. Eq. 270 (Ch. 1895), the court held that the 1891 law created a limited permissive exception to the 1857 statute but did not repeal it.
A supplement to the 1857 act was effected by L. 1895, c. 344, which established a "per line" computation for counties *227 of the first class; legal notices were to be charged for at the rate of "ten cents per line for the first insertion, and five cents a line for each subsequent insertion, and no more; provided, that in computing any such charge per line for said notice the line must average at least eight words." The 1895 law was amended by L. 1898, c. 187, which introduced the term "agate line" by providing, with respect to first class counties, that the charge was to be "ten cents per agate line for the first insertion and five cents an agate line for each subsequent insertion, and no more."
In 1909 the Legislature brought together, in revised form, the 1857 law and later statutes. L. 1909, c. 67, may be considered as the first direct antecedent of the present statutory language contained in N.J.S.A. 35:2-1. It repealed all inconsistent acts. We reproduce the full text:
1. Hereafter the price to be paid for publishing all official advertising in the newspapers, published in cities of the first and second class, or in counties of the first or second class in this State, shall be at the rate of ten cents per agate (or 5 1/2 point) line for the first insertion, and eight cents per agate line for each subsequent insertion; provided, that in computing such charge per line, the lines shall average at least seven words.
2. Hereafter the price to be paid for publishing official advertisements in any newspaper, except newspapers published in cities of the first or second class, or in counties of the first or second class, shall be at the rate of five cents per nonpareil (or 6 point) line for each insertion; provided, that in computing such charge per line, the lines shall average at least seven words.
3. In reckoning line charges allowances shall be made for date lines, paragraph endings, titles, signature, and similar short lines as full lines where the same are set to conform to the usual rules of composition.
L. 1919, c. 52, repealed section 2 of the 1909 act and amended section 1 to provide that
Hereafter the price to be paid for publication of official advertising in the newspapers published in this State shall be at the rate of ten cents per agate or nonpareil line for the first insertion, and eight cents per agate or nonpareil line for each subsequent insertion, provided, that in computing such charge per line the line shall average at least six words.
*228 The 1920 Legislature reverted to classification of official advertising found in the 1909 law when it provided, in L. 1920, c. 6, that in the case of first and second class cities or counties the rate for official advertising was to be "(12) twelve cents per agate (or 5 1/2-pt.) line for the first insertion, and (10) ten cents per agate line for each subsequent insertion; provided that in computing such charge per line, the line shall average at least six words." As to all other newspapers, the rate was "(10) ten cents per agate or nonpareil (or 6-pt.) line for the first insertion and (8) eight cents per agate or nonpareil line for each subsequent insertion," the line to average at least six words. Section 3 of the 1909 act, quoted above, was included as section 3 of the new act. L. 1920, c. 6 was incorporated in section 35:2-1 of the 1937 Revised Statutes.
R.S. 35:2-1 was amended by L. 1944, c. 156, which read as follows:
a. In newspapers published in cities of the first and second classes, or in counties of the first, second, third and fifth classes, twelve cents ($0.12) per agate (or five and one-half point) line for the first insertion and ten cents ($0.10) per agate line for each subsequent insertion; * * * [higher rates were provided for newspapers in certain circulation categories of 20,000 or more copies daily or Sunday], but before any newspaper can charge the foregoing rates, the publisher or business manager of such daily or Sunday newspaper must file with the properly authorized officer of every municipality, county or governing body, placing official advertising in such newspaper, an affidavit setting forth the average net paid circulation of such newspaper for the twelve months' period ending September thirtieth next preceding and the rate to be charged for official advertising, which in no case shall be in excess of the rates provided in the foregoing schedule.
As to all other newspapers, the charge was to be ten cents "per agate or nonpareil (or six point) line for the first insertion" and eight cents for each subsequent insertion. The 1944 statute also incorporated paragraph 3 of the 1909 and 1920 acts relating to short lines.
The statute was again amended by L. 1952, c. 250. It eliminated the classification by cities and counties contained *229 in the 1944 act, making paragraph (a) of that act applicable to all newspapers. In addition, the 1952 statute substituted the following for the "short lines" paragraph of the 1944 act:
The charge per agate or nonpareil line shall be based on measurement by the standard newspaper ruler, but date lines, paragraph endings, titles, signatures and similar short lines shall be computed as full lines where set to conform to the usual rules of composition.
A further amendatory statute, L. 1955, c. 233, changed only the rates that might be charged by newspapers of different circulation volumes, retaining the last-quoted provision in the 1952 act basing the charge per agate or nonpareil line on "measurement by the standard newspaper ruler."
Finally, L. 1962, c. 130, amended section 35:2-1 to read as it does at the moment of this writing. The 1962 act continued the scheme of the 1952 and 1955 amendments in providing a series of escalating rates based on average net paid circulation. It also continued the language of those amendments which fixed rates on the basis of "per agate (or 5 1/2 point) line." It is of significance that this latest enactment deleted the last paragraph of the 1952 act which permitted lines to be measured by the "standard newspaper ruler," substituting instead the following paragraph:
The charge per agate or 5 1/2 point line shall be based on measurement of a line of not less than 10 ems in width, but date lines, paragraph endings, titles, signatures and similar short lines or lines that require special emphasis, such as the title of the notice, shall be computed as full lines where set to conform to the usual rules of composition.
Extensive research by counsel and this court has failed to uncover any significant legislative history. There are no committee reports, and the Statements which accompanied only two of the bills enacted into law  1920 and 1952  provide no help in construing N.J.S.A. 35:2-1. We are relegated to the language of the statutes summarized above.

*230 II
The obvious function and purpose of the sequence of statutes has been to regulate and limit the charges which a newspaper may impose for official advertising. The Legislature, in moving from a rate "per folio (one hundred words)" in the 1857 act, initially fixed a maximum rate "per line," and in subsequent years and other successive stages more specifically described the "line." Thus, in 1898 the charge was "per agate line"; in 1909 "per agate (or 5 1/2 point) line" and "per nonpareil (or 6 point) line." The "per agate (or 5 1/2 point) line" as a basis for official advertisement charges has persisted down to and through the 1962 enactment. The clear legislative expression has been that the rate to be charged by newspapers for official advertising was to be by lines. Only once did the Legislature speak of a rate fixed by space, and that was in L. 1952, c. 250, when, in the last paragraph of the statute (quoted above) the charge per agate or nonpareil line was to be based on "measurement by the standard newspaper ruler." This standard was maintained in the amendment effected by L. 1955, c. 233, but, as stated, was deleted by the 1962 enactment, now the applicable law.
The industry of plaintiffs' counsel has brought to our attention the statutes of 39 sister states governing official advertising, noting that none fixes rates in a manner which permits a publisher to increase his charges by expanding the physical composition of an official advertisement through the use of larger type, setting type on larger slugs, spacing slugs apart, or by any other copy-expanding device. Although appreciative of this legal research, we are necessarily confined to construing our own statute, and particularly so when we find that in only two or three cases have the laws of other states been discussed by their courts.
The only New Jersey case dealing with the rate to be charged for official advertisements is Sheehey v. Mayor, etc., Hoboken, 62 N.J.L. 184 (Sup. Ct. 1898), decided under *231 L. 1891, c. 223 which called for a "per line" computation of rate for official advertising by first and second class cities. The bills presented to the governing body by the local Hoboken newspapers were made out on the theory that a "line" under the act in question meant so much space in a column as would be occupied by a line of words, letters or figures printed in agate type. Since the advertisements were all printed in type larger than agate, the prices charged were higher than warranted. The court observed that the testimony tended to prove that it was customary among newspapers to charge for advertising according to the space occupied, and to indicate that space by the number of lines which might be printed in it with agate type. The newspapers insisted that such was the legislative intent expressed in the 1891 statute. The court said:
But we cannot so interpret the law. The word "line" is not a technical term, but one in common use, and having in common usage, when applied to printed matter, a well-known signification. It then means a row of words, letters, or figures printed across a page or column, without regard to the size of the type. [62 N.J.L. at 185]
As we read the holding in Sheehey, it was that a "line" means an actual line and not the space that might be occupied by a line of type. Subsequent amendments of the statute to include "per agate (or 5 1/2 point)" and "per agate or nonpareil (or 6 point)" line do not impair this common sense construction of the statute.
It is clear that if newspapers like the Press-Journal were permitted to charge for gross space, they could, by setting in a somewhat larger type or on a larger slug, enjoy increased advertising revenues at the expense of those placing the official advertisements. The practice of the Press-Journal provides a ready illustration. If the "line" count of the statute as we construe it were to be followed, an agate (or 5 1/2-point) line would produce 14 lines to the inch. The newspaper uses 6-point type, which runs 12 lines to the inch. By measuring space with an agate ruler, rather than counting *232 lines, the newspaper charged for two extra lines. The fact that Palisades had nothing smaller than 6-point type for use in the Press-Journal is no excuse; it could readily have obtained a smaller agate font.
If there is any question as to the legislative purpose, last expressed in the 1962 statute, that official advertising is to be charged at a rate per agate (or 5 1/2-point) line, it is set at rest by Assembly Bill No. 682, introduced by a Bergen County assemblyman  Englewood is in Bergen  on March 9, 1970 after the Law Division judge had delivered his oral opinion on February 26, 1970. The bill has passed both Houses of the Legislature and at the moment awaits the Governor's signature. The proposed law would amend N.J.S.A. 35:2-1 (L. 1962, c. 130, § 1) by eliminating the parenthesis in the phrase "per agate (or 5 1/2 point) line" and, further, the last paragraph of the statute, quoted early in this opinion. In place of the last paragraph, Assembly Bill No. 682 would provide:
The fee for publishing an official advertisement shall be computed by measuring the vertical space occupied by the official advertisement, inclusive of heading and fee lines, with an agate ruler and multiplying the resulting number of agate lines by the rate applicable for that newspaper's circulation.
Each agate line so measured shall be not less than nine picas in width. Datelines, paragraph endings, headings, titles, signatures, fee lines and similar short line or lines, lines that require special emphasis and the blank spaces between the above lines shall be measured by agate line in the manner provided above, as part of the official advertisement in which such lines appear in the absence of any agreement to the contrary between newspaper and customer.
The Statement accompanying the bill represents that its proposals are intended, among other things, to
1. Create a uniform standard of measurement of column depth using the concept of "agate line" as measured with an agate ruler.
a. Eliminate any vestiges of measurements which are based on the mere counting of lines not using an agate ruler.
This is a clear reversion to the "measurement by the standard newspaper ruler" provision of L. 1952, c. 250, *233 which was abandoned when L. 1962, c. 130, became effective. If signed into law[*], it will control rates to be charged thereafter. It cannot give comfort to Palisades, which has used the agate-rule method of measuring space and charged on that basis, instead of charging by the agate (or 5 1/2-point) line.

III
Palisades has charged for the printing of a "Public Notice" heading which it inserted with line dividers above and below, as well as for the "Press-Journal" insertion at the end of the official advertisement. The publisher admits that these insertions are made whether they are included in the copy submitted by the advertiser or not. In submitting official advertisements for publication in the Press-Journal, the city clerk did not include either the words "Public Notice" or the name of the paper in the copy sent to the newspaper on the city's form. Nonetheless, Palisades made the insertions in accordance with its usual practice.
It may be, as Palisades contends, that including the words "Public Notice" at the head of the official advertisement serves to bring it to the public's attention, and printing "Press-Journal" at the end of the advertisement serves a research purpose. But the statute does not require either the heading or any mention of the newspaper's name. The city did not request either insertion. It was not for Palisades to exercise its own judgment and determine what is useful or appropriate. Printing "Public Notice," with line dividers above and below, and "Press Journal" after the advertisement, added four agate lines and resulted in an extra cost to the city of 88¢, based upon the 22¢ rate. Englewood should not be called upon to pay this extra charge. Cf. Mandan News Publishing Co. v. Board of City Comm'rs, of Mandan, 49 N.D. 756, 193 N.W. 608 (Sup. Ct. 1923); Wisner v. Morrill Cty., 117 Neb. 324, 220 N.W. 280 (Sup. Ct. 1928).

*234 IV
Plaintiffs contend that Palisades is not entitled to impose the statutory charges for publishing Englewood's official advertisements because it did not file with the properly authorized municipal officer placing the official advertisements in the Press-Journal (in this case, apparently, the city clerk) an affidavit stating the average net paid circulation for the 12-month period ending the preceding September 30 and the rate to be charged for the official advertising, as required by N.J.S.A. 35:2-1. Palisades conceded, and it was affirmatively established by the deposition of the city clerk, that it was not until after the present action was instituted that the publisher filed the required affidavit with the city. However, Palisades had submitted to the city clerk copy of the annual notice published as required by 39 U.S.C.A., § 4369, showing the average number of copies of each issue during the preceding 12 months. Although the annual statements so filed were not sworn to, nor set out the rate to be charged for official advertisements, we agree with the trial judge that no forfeiture should be visited upon Palisades. The fact is that the city did receive a statement of circulation each year, and since the rate, based on net paid circulation, was listed in the statute, the city would not have been further enlightened had it received the properly executed affidavits. The city benefited from the publication of the official advertisements. There is no showing that it was in any way prejudiced by Palisades' failure to file the required affidavits.
We reverse with the direction that a judgment accordant with this opinion be entered and a further hearing held to determine the amount of the overpayments made by Englewood to Palisades.
NOTES
[*] The bill was not signed.