995 A.2d 306 (2010)
413 N.J. Super. 372
COURIER-POST NEWSPAPER, A Division of Gannett Satellite Information Network, Plaintiff-Appellant, and
Penn Jersey Advance, Inc., Plaintiff,
v.
COUNTY OF CAMDEN and Camden County Municipal Utilities Authority, Defendants-Respondents, and
County of Gloucester and Philadelphia Newspapers, LLC, Defendants.
Courier-Post Newspaper, A Division of Gannett Satellite Information Network, Plaintiff-Appellant,
v.
Charles H. Billingham, Sheriff of the County of Camden, and the Office of Sheriff of the County of Camden, Defendants-Respondents.
DOCKET NO. A-2993-08T3.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 2009.
Decided May 20, 2010.
*308 Daniel D. Haggerty, Philadelphia, PA, argued the cause for appellant (Weir & Partners, L.L.P., attorneys; Mr. Haggerty, on the brief).
Howard L. Goldberg, Blackwood, argued the cause for respondents County of Camden (Michael G. Brennan, Camden County Counsel; Donna M. Whiteside, Assistant County Counsel, on the brief).
Laurence E. Rosoff, Solicitor, attorney for respondent Camden County Municipal Utilities Authority, joins in the brief of respondents County of Camden.
Thomas J. Cafferty argued the cause for amicus curiae New Jersey Press Association *309 (Scarinci Hollenbeck, attorneys; Mr. Cafferty, Nomi I. Lowy and Lauren E. James, Lyndhurst, on the brief).
Before Judges RODRÍGUEZ, REISNER and CHAMBERS.
The opinion of the court was delivered by
CHAMBERS, J.A.D.
The disputes in this case arise out of the decisions by Camden County and the Sheriff of Camden County to publish legal notices in The Philadelphia Inquirer, an out-of-state newspaper, at rates less than those specified in N.J.S.A. 35:2-1.[1] In this appeal, we must decide four questions.
The first question is whether the plaintiff, Courier-Post Newspaper, a Division of Gannett Satellite Information Network (the Courier-Post), which is qualified to publish legal notices for Camden County and the Sheriff of Camden County and has done so in the past, has standing to challenge these arrangements. We conclude that it does.
The second question is whether The Philadelphia Inquirer is "printed and published within the State of New Jersey" for the purposes of being qualified to publish legal notices pursuant to N.J.S.A. 35:1-2.2. We conclude that The Philadelphia Inquirer is "printed and published" in Pennsylvania where its home office is located and where the newspaper is physically printed on newsprint. It may not be considered "printed and published" in New Jersey even though its newspaper is available on the Internet and may be viewed and printed by readers on their computers in New Jersey. For similar reasons, The Philadelphia Inquirer is not "printed and published" in Camden County within the meaning of N.J.S.A. 2A:61-1, which governs sheriffs' notices of real estate sales.
The third question is whether Camden County or the Sheriff of Camden County may arrange to print legal notices with a newspaper for less than the statutory rates set forth in N.J.S.A. 35:2-1. We find no authority to allow a county or sheriff to circumvent the statutory requirement and hold that the statutory rates must be followed.
The final question is whether statutory provisions which do not allow legal notices of a county or sheriff to be published in out-of-state newspapers violate the Commerce Clause of the United States Constitution. U.S. Const. art. I, § 8, cl. 3. We conclude that they do not, because a state, including its subdivisions, when acting as a consumer, may prefer in-state businesses without violating the Commerce Clause.
In light of these determinations, we reverse the decision of the trial court that granted summary judgment in favor of defendants, and we remand for entry of an order in accordance with this decision.

I
The circumstances leading to this litigation began in January 2007, when the Board of Chosen Freeholders of Camden County published a notice in The Philadelphia Inquirer and the Courier-Post seeking proposals from newspapers "for discounted newspaper advertising" for publication of legal notices and advertisements. This Request for Proposals (RFP) was issued in furtherance of the County's authority under N.J.S.A. 40:23-13, which accords to counties the responsibility of designating "an official newspaper *310 or newspapers in which shall be published all advertisements and notices required by law to be published." The notice advised that: "This Request For Proposals does not constitute a bid and is intended solely to obtain competitive proposals from which the Counties may choose the newspaper(s) that best meet(s) the Counties['] needs as they relate to discounted advertising services."[2]
The Courier-Post did not respond to the RFP. However, Philadelphia Newspapers, L.L.C., the publisher of The Philadelphia Inquirer, (The Philadelphia Inquirer), did submit a proposal to Camden County offering advertising rates lower than those fixed by N.J.S.A. 35:2-1.
The Board of Chosen Freeholders for Camden County designated The Philadelphia Inquirer as an official newspaper pursuant to N.J.S.A. 40:23-13 and N.J.S.A. 35:1-1 to -4. Accordingly, Camden County entered into a written two-year agreement in which The Philadelphia Inquirer agreed to publish the legal notices and advertisements for Camden County at the reduced rates set forth in its proposal.
The Courier-Post brought an action in lieu of prerogative writs seeking to enjoin Camden County from using The Philadelphia Inquirer to publish legal notices and seeking declaratory relief and compensatory damages.[3] We will not review all of the procedural details of the litigation, but note the following salient events. The Philadelphia Inquirer was granted leave to intervene[4] and participated in the proceedings before the trial court. The Courier-Post's request for temporary restraints was denied.
Shortly after the litigation began, the Sheriff of Camden County stopped publishing in the Courier-Post notices of public sales of real estate under N.J.S.A. 2A:61-1 and began to publish these notices in The Philadelphia Inquirer. As a result, the Courier-Post brought separate litigation against Charles H. Billingham, Sheriff of Camden County and the Office of Sheriff of Camden County (the Sheriff). The two cases were thereafter consolidated.
At the conclusion of discovery, on cross-motions for summary judgment, the trial court held that the Courier-Post did not have standing to challenge Camden County's contract with The Philadelphia Inquirer because it had not submitted a proposal to Camden County. The court further determined that The Philadelphia Inquirer was printed and published in New Jersey. Due to the substantial and long standing circulation of The Philadelphia Inquirer within southern New Jersey, the court noted that the Legislature's intent in the advertising statute to provide notice to a great number of taxpayers was served by allowing the notices to be published in The Philadelphia Inquirer. By order dated January 27, 2009, it granted summary judgment to defendants and denied plaintiff's motion for summary judgment.
The Courier-Post has appealed. While the appeal was pending, The Philadelphia Inquirer filed a voluntary petition for *311 bankruptcy and was dismissed from this suit. The New Jersey Press Association was granted leave to appear as amicus curiae.
When reviewing decisions on motions for summary judgment, we apply the same standard as the trial court. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). Summary judgment will be granted when, after considering the evidence from the point of view most favorable to the non-movant, the court finds that no genuine issue of material fact is present and the movant is entitled to a judgment as a matter of law. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); R. 4:46-2(c). We do not defer to the trial court's interpretation of the law, or its determination of the legal consequences that flow from undisputed facts. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). In this case, the material facts are not in dispute, rather the dispute centers on the application of the law to those facts.

II
We first consider whether the Courier-Post has standing to challenge the placement of legal notices by Camden County and the Sheriff in The Philadelphia Inquirer. The issue of standing presents a legal question subject to our de novo review. In re Project Authorization Under N.J. Register of Historic Places Act, 408 N.J.Super. 540, 555, 975 A.2d 941 (App.Div.2009), certif. denied, 201 N.J. 154, 988 A.2d 1177 (2010).
New Jersey courts have historically applied "liberal rules of standing." Jen Elec., Inc. v. County of Essex, 197 N.J. 627, 645, 964 A.2d 790 (2009) (quoting N.J. Builders Ass'n v. Mayor of Bernards Twp., 219 N.J.Super. 539, 539, 530 A.2d 1254 (App.Div.1986), aff'd, 108 N.J. 223, 528 A.2d 555 (1987)). We accord standing to a litigant who has "a sufficient stake and real adverseness with respect to the subject matter of the litigation [and a] substantial likelihood of some harm ... in the event of an unfavorable decision." Ibid. (alteration in original) (quoting In re Adoption of Baby T, 160 N.J. 332, 340, 734 A.2d 304 (1999)). A litigant with a financial interest in the outcome of the litigation will ordinarily have standing. Marshall v. Raritan Valley Disposal, 398 N.J.Super. 168, 176, 940 A.2d 315 (2008).
Here, the Courier-Post has a direct financial stake in the issues presented in this litigation. It has previously published legal notices for defendants and maintains that it is qualified to do so. Further it contends that if the law were properly followed, it would be the only daily newspaper qualified to publish notices for the Sheriff. Hence, it has a financial interest in defendants' decisions to place legal notices in The Philadelphia Inquirer. Its interests are adverse to defendants. Under traditional notions of standing, these circumstances are sufficient to allow the Courier-Post to pursue this claim.
Defendants, however, maintain that the Courier-Post has no standing to challenge the contract because it did not submit a response to Camden County's RFP. The arguments of defendants based on the bidding law are misplaced because contracts for the publication of legal notices are exempt from the statutory bidding requirements. N.J.S.A. 40A:11-5(1)(j). Further, if the Courier-Post had participated in the RFP, it may have been estopped from challenging the propriety of the RFP process. See Autotote Ltd. v. N.J. Sports & Exposition Auth., 85 N.J. *312 363, 369, 427 A.2d 55 (1981) (stating that, in the context of a claim that a contract should have been awarded by public bidding, "a party is estopped from challenging the award of a contract which it actively sought through the same procedures it now attacks" although the Court declined to apply estoppel due to the strong public policy issues in the case).
Even if the Courier-Post should have participated in the RFP to obtain standing, we exercise our discretion to consider the issues raised in this appeal due to their public importance and the concern that the statutes are so clearly being violated. See ibid. (addressing the question of whether a matter should have gone to public bidding even though, under traditional rules, plaintiff was estopped from challenging the contract, the Court considered the merits of the dispute due to the "paucity of judicial attention" to the statute involved, the "substantial public importance and large sums of public monies at stake," and the fact that the issues were fully developed by the parties and were likely to arise again); see also Madden v. Twp. of Delran, 126 N.J. 591, 597 n. 1, 601 A.2d 211 (1992) (reaching the merits of a dispute due to its public importance despite objections "concerning standing, justiciability, mootness, and the propriety of declaratory judgment relief").

III
We next address whether The Philadelphia Inquirer may be considered "printed and published" in New Jersey. Title 35 governing legal advertisements is broad in scope, defining "official advertising" and "official advertisements" to include "all matters required by law to be published." N.J.S.A. 35:1-1. In order to be qualified to print official advertisements, a newspaper must, among other requirements, be "printed and published" in New Jersey. N.J.S.A. 35:1-2; N.J.S.A. 35:1-2.2. Specifically, N.J.S.A. 35:1-2.2, which deals with publication of legal notices by counties, officials and others, provides:
Whenever, by law, it is required that there be published by printing and publishing in a newspaper or newspapers, ordinances, resolutions or notices or advertisements of any sort, kind or character by any county, city or other municipality or municipal corporation, or by any municipal board or official board, or body, or office, or officials, or by any person or corporation, such newspaper or newspapers must, in addition to any other qualification now required by law, meet the following qualifications, namely: said newspaper or newspapers ... shall be printed and published within the State of New Jersey....
[N.J.S.A. 35:1-2.2.]
Plaintiff contends that The Philadelphia Inquirer does not qualify under the statutes because it is not "printed and published" in New Jersey.
When construing a statute, our goal is to determine the Legislature's intent. In this endeavor, we must give the words used in the legislation their ordinary and usual meaning and "read them in context with related provisions so as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005). Where the language is "clear and unambiguous," we enforce the statute as written. Middletown Twp. PBA Local 124 v. Twp. of Middletown, 193 N.J. 1, 12, 935 A.2d 516 (2007) (quoting Comm. to Recall v. Casagrande, 304 N.J.Super. 496, 510, 701 A.2d 478 (Law Div.), aff'd, 304 N.J.Super. 421, 701 A.2d 439 (App.Div.1997)). It is only when the statute is "silent or ambiguous" that we consult extrinsic *313 evidence to ascertain the Legislature's intent. Ibid.

(A)
With respect to whether The Philadelphia Inquirer is "printed" in the State of New Jersey, the record is undisputed that paper copies of The Philadelphia Inquirer are printed on newsprint with news ink on printing presses located in Conshohocken, Pennsylvania.[5] Thus, the physical printing of the newspaper takes place in Pennsylvania.
Regarding whether The Philadelphia Inquirer is "published" in New Jersey, the record indicates that the activities central to the creation and production of the newspaper are headquartered in Pennsylvania. The main address and office of The Philadelphia Inquirer is in Philadelphia, where the newspaper's executive offices and newsrooms are located. The Philadelphia Inquirer has acknowledged that Philadelphia is its "principal site of writing and editing" and its "main location for [n]ews-gathering and [a]dvertising." The newspaper also has located in Philadelphia its systems and technology support, finance, marketing and promotion operations, circulation administration, human resources, prepress operations, facilities to maintain its online product, general and administrative employees, and graphic artists.
We recognize that the The Philadelphia Inquirer does have ties to New Jersey with a number of offices in New Jersey where local news is covered and some advertising sales are conducted. The work for a number of magazine inserts for the newspaper is performed in New Jersey. In addition, The Philadelphia Inquirer has a number of circulation facilities in New Jersey. Nonetheless, although it does perform some of its work in New Jersey, the center for its operation and the bulk of its work is performed in Pennsylvania. In 2008, only 130 of its 3,589 full-time and part-time employees worked in New Jersey.
Based on this record, The Philadelphia Inquirer is not published in New Jersey. A work is considered "published" when it is "[declared] publicly, [or made] generally known," such as when a book is offered for sale or put in general circulation. City of Plainfield v. Courier News, 72 N.J. 171, 182-83, 369 A.2d 513 (1976) (quoting Webster's Third International Dictionary). This need not be the place where it is printed. Id. at 183, 369 A.2d 513. In the context of determining a newspaper's qualification to carry legal notices, long ago, in a decision written by Mr. Justice Holmes, the Supreme Judicial Court of Massachusetts set forth the "home office" concept, concluding that a newspaper was published where its "home office" was located, which is where "the paper was given to the world." Rose v. Fall River Five Cents Sav. Bank, 165 Mass. 273, 43 N.E. 93, 93-94 (1896).
While recognizing that the place of publication is an elusive concept, the New Jersey Supreme Court in City of Plainfield, supra, 72 N.J. at 186-87, 369 A.2d 513, determined that the place of publication is best defined as the location where the newspaper is first "given to the world," (quoting Rose v. Fall River Five Cents Sav. Bank, supra, 43 N.E. at 94), or where the newspaper is "completely prepared for distribution," (quoting Vill. of Tonawanda v. Price, 171 N.Y. 415, 64 N.E. 191, 192 (1902)). Phrased another way, the place of publication is where the "first step in the process of putting the paper into circulation" occurs, although that is not "the first *314 moment at which copies of the paper are actually received by the public." Id. at 187, 64 N.E. 191 (emphasis omitted). Under the facts presented in the City of Plainfield, the Court determined that the newspaper's place of publication was in Bridgewater Township because that was where "[a]ll final editing, printing, correction of printed proofs, assembly, bundling, truck delivery, and mailing [took] place" and that location was the "home office" of the paper and "the place from which the paper [was] `given to the world.'" Id. at 187-88, 369 A.2d 513.
The approach taken in City of Plainfield in determining the place of publication has been followed by other jurisdictions addressing similar questions in the context of legal notices. See Express Publ'g, Inc. v. City of Ketchum, 114 Idaho 114, 753 P.2d 1260, 1263 (1988) (concluding that a newspaper is not "published" in a city in which it has only a satellite office when its principal office is located elsewhere); Beaufort v. Warwick Credit Union, 437 A.2d 1375, 1377-78 (R.I.1981) (applying the "home-office concept," the court concluded that a newspaper is not published in the town where it is first put into circulation, but rather where its home office is located); Okla. Journal Publ'g Co. v. City of Oklahoma City, 620 P.2d 452, 455 (Okla.App.1979) (concluding that a newspaper was published in Midwest City "because that is where its principal offices are located, that is where its content is determined, that is where it is edited, and that is the place from which the newspaper is disseminated" and rejecting the argument that the newspaper was published in the city where it maintained several distribution offices).
As a result, under ordinary circumstances a newspaper will have only one place of publication, namely its home office, from whence "the paper [is] given to the world" and prepared for distribution. City of Plainfield, supra, 72 N.J. at 180, 186-87, 369 A.2d 513 (alteration in original) (quoting Rose v. Fall River Five Cents Sav. Bank, supra, 43 N.E. at 94). The Court left open the possibility that a newspaper with "national circulation, with editorial offices on both east and west coasts at which different `editions' were prepared and issued" may be able to successfully argue that it is published in more than one location. Id. at 187-88, 369 A.2d 513. But that is not the situation here. The Court expressly stated that a large metropolitan newspaper may not become eligible to publish legal advertisements and be deemed to "publish" in a particular location solely by opening a branch office there. Id. at 188, 369 A.2d 513.
Accordingly, The Philadelphia Inquirer is not printed or published in New Jersey within the meaning of the legal advertising statutes and does not meet the qualifications to publish official advertisements under Title 35. For these same reasons, The Philadelphia Inquirer is not "printed and published" in Camden County for purposes of N.J.S.A. 2A:61-1. That statute requires a sheriff to place legal notices of real estate sales in newspapers that, among other qualifications, must be "printed and published" in the county, provided there are newspapers to meet this qualification. N.J.S.A. 2A:61-1.[6]

*315 (B)
Defendants attempt to circumvent this well-established law by arguing that because The Philadelphia Inquirer is available online and may be viewed and printed out from a computer in New Jersey, it should be considered "printed and published" in New Jersey within the meaning of the legal advertising statutes. However, given the unlikelihood of a reader printing out an entire edition of an online newspaper, we cannot reasonably say that a newspaper is "printed" in New Jersey because it is available online.
Further, the place of publication is the location where the newspaper is prepared and "given to the world." City of Plainfield, supra, 72 N.J. at 186-87, 369 A.2d 513. It is not the place where the reader receives the newspaper. Thus, a reader sitting before her home computer reading an online version of The Philadelphia Inquirer is viewing a paper published in Pennsylvania, just as her neighbor reading a paper copy of The Philadelphia Inquirer at his breakfast table is also reading a newspaper published in Pennsylvania. While the Internet may change the manner of distribution of The Philadelphia inquirer and allows it to be available more readily to a wider audience through an online edition, its place of publication is still unchanged.
Defendants' interpretation of the statutory requirement that the newspaper be printed and published in New Jersey would render the restriction virtually meaningless because any newspaper from any part of the globe that is available online could then be considered printed and published in New Jersey. The purpose of the advertising statute, N.J.S.A. 35:1-2.2, is to require that legal notices be presented in newspapers "that are read and understood by a cross-section of the community, and that have `stability and continuous existence in the municipalities where their publication offices are maintained.'" City of Plainfield, supra, 72 N.J. at 177, 369 A.2d 513 (quoting In re Bond Printing Co., Inc., 135 N.J.L. 478, 480, 52 A.2d 762 (E. & A.1947)).
Deeming all online newspapers to meet the requirement of being printed and published in New Jersey would not serve this purpose. Such a result would eliminate the physical connection between the newspaper's operation and the community. This physical connection is significant because a local newspaper is where people will ordinarily go for local news whether online or at the local newsstand. By requiring that newspapers carrying legal notices be printed and published in New Jersey, the Legislature is assuring that the legal notices are published in newspapers where those most likely to be interested in the notices may see them.

IV
We next address whether defendants' placement of legal notices in The Philadelphia Inquirer violates the statute governing the rates for official advertising. N.J.S.A. 35:2-1 sets forth the exact rates that newspapers must charge for "official advertising." We conclude that by deviating *316 from these statutory rates, defendants are violating the statute.
The statute fixes a specified rate that must be charged per line, depending on the newspaper's net paid circulation. Specifically, it provides in pertinent part:

The price to be paid for publishing all official advertising as defined in R.S. 35:1-1 in newspapers shall be as follows: In newspapers published in the State of New Jersey having a bona fide net paid circulation of up to 2,500 copies, the rate shall be $0.25 per line for each insertion; in the case of any newspaper having a bona fide net paid circulation of not less than 2,500 copies nor more than 5,000 copies, the rate shall be $0.31 per line for each insertion; ... and in the case of any newspaper having a bona fide net paid circulation in excess of 300,000 copies the rate shall be $1.00 per line per insertion; but before any newspaper can charge the foregoing rates, the publisher or business manager of such newspaper must file ..., an affidavit setting forth the average net paid circulation of such newspaper for the 12-month period ending September 30 next preceding and the rate to be charged for official advertising, which in no case shall be in excess of, or below, the rates provided in the foregoing schedule.

[N.J.S.A. 35:2-1 (emphasis added).]
The larger the newspaper's circulation, the higher the rate allowed by the statute. The statutes in New Jersey have set a fixed rate for official advertising since at least the mid-nineteenth century. L. 1857, c. 137;[7]see Gamrin v. Palisades Newspapers, Inc., 117 N.J.Super. 219, 230-33, 284 A.2d 355 (App.Div.1971) (setting forth an historical discussion of the predecessors to N.J.S.A. 35:2-1), certif. denied, 60 N.J. 466, 291 A.2d 16 (1972).
Since The Philadelphia Inquirer has a paid circulation in excess of 300,000, if it were eligible to print notices, the statute would require that it charge a rate of $1.00 per line. Contrary to this statutory requirement, Camden County's agreement with The Philadelphia Inquirer sets forth the following rates:
a. South Jersey Weekday Rate shall be [$].24 per agate line;
b. South Jersey Sunday Rate shall be [$].63 per agate line;
c. Full Run Weekday rate shall be [$].75 per agate line;
d. Full Run Sunday rate shall be $1.00 per agate line.
Thus, the rates charged by The Philadelphia Inquirer do not conform to the statutory rate.
Defendants argue that the statute was designed to protect taxpayers from excessive advertising rates and that this agreement does not offend that purpose because it provides for lower rates than those required by the statute. This argument overlooks the basic rule of statutory interpretation, namely, that "[i]n the absence of any explicit indication of special meaning, words of a statute are to be given their ordinary and well understood meaning." Gallo v. Mayor of Lawrence Twp., 328 N.J.Super. 117, 123-24, 744 A.2d 1219 (App.Div.2000) (quoting Levin v. Twp. of Parsippany-Troy Hills, 82 N.J. 174, 182, 411 A.2d 704 (1980)). We will not "rewrite a plainly-written enactment of the Legislature." DiProspero v. Penn, supra, *317 183 N.J. at 492, 874 A.2d 1039 (quoting O'Connell v. State, 171 N.J. 484, 488, 795 A.2d 857 (2002)).
Here, the statute plainly requires that the specified statutory rates be followed, stating: "The price to be paid for publishing all official advertising as defined in R.S. 35:1-1 in newspapers shall be as follows" and specifies the rates as discussed above. N.J.S.A. 35:2-1. It further provides that the newspaper must submit an affidavit to the "properly authorized officer of every municipality, county or governing body ... setting forth the average net paid circulation" and the advertising rate, "which in no case shall be in excess of, or below, the rates provided in the foregoing schedule." Ibid. (emphasis supplied).
Certainly, one legislative purpose in fixing the advertising rates by statute is to protect the public from inflated rates. See Gamrin v. Palisades Newspapers, Inc., supra, 117 N.J.Super. at 230, 284 A.2d 355 (stating that "[t]he obvious function and purpose of the sequence of statutes has been to regulate and limit the charges which a newspaper may impose for official advertising"). However, the Legislature may have perceived other benefits in this arrangement such as eliminating monetary negotiations between the press and government officials on the advertising rates. The New Jersey Press Association maintains that a fixed rate "removes the temptation of a public entity to favor, with a higher rate for the publication of official advertising, a newspaper whose coverage the public body perceives as favorable and, likewise, to punish with a lower rate, a newspaper whose coverage the public body may view as less favorable." In any event, any debate about the wisdom of the current statute must be addressed by the Legislature.
Defendants also argue that the cost of newspaper advertising has decreased over the years and that taxpayers should benefit from those decreases. However, over the years, the Legislature has increased rates to reflect the increasing cost of advertising in the market. If, indeed, market conditions have caused the cost of advertising to be lowered, the Legislature may adjust the rates downward. In any event, at the current time, the agreement between Camden County and The Philadelphia Inquirer violates N.J.S.A. 35:2-1 because it provides for rates other than those allowed by that statute.

V
We also reject defendants' argument that the statute requiring legal notices to be placed in newspapers published and printed in New Jersey violates the Commerce Clause of the United States Constitution.[8]
The Commerce Clause provides that "Congress shall have Power ... To regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause has been interpreted to limit implicitly the power of the states to interfere with or burden interstate commerce. W. & S. Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 652, 101 S.Ct. 2070, 2074, 68 L.Ed.2d 514, 520 (1981). Jurisprudence under this so-called "Dormant Commerce Clause" distinguishes between conduct of a state when it acts as a market participant and when it acts as a regulator. Coll. Sav. Bank. v. Fla. Prepaid Postsecondary Ed. Expense *318 Bd., 527 U.S. 666, 685, 119 S.Ct. 2219, 2230, 144 L.Ed.2d 605, 622 (1999). When a state acts as a market participant, it is not bound by the constraints of the Commerce Clause. White v. Mass. Council of Constr. Employers, Inc., 460 U.S. 204, 208, 103 S.Ct. 1042, 1044-45, 75 L.Ed.2d 1, 6 (1983). As a participant in the market, a state may extend a preference to in-state businesses. See id. at 214-15, 103 S.Ct. at 1048, 75 L.Ed.2d at 10 (upholding a mayor's executive order requiring that at least half of the workforce for construction projects funded in whole or in part by city funds reside in the city); Reeves, Inc. v. Stake, 447 U.S. 429, 446-47, 100 S.Ct. 2271, 2282, 65 L.Ed.2d 244, 257 (1980) (upholding policy of state owned cement plant to fill orders of state customers first). As a result, the statutes limiting newspaper advertising by counties and sheriffs to newspapers printed and published in the state concern transactions of the state and its governmental entities as purchasers of newspaper advertising and do not implicate the Commerce Clause.[9]
Finally, while we conclude that, prospectively, defendants must conduct their advertising in compliance with the applicable statutes, nothing in this opinion should be read as requiring republication of notices that have already been published by defendants in The Philadelphia Inquirer.
Reversed and remanded.
NOTES
[1] The Camden County Municipal Utilities Authority is also a defendant in this case. However, on appeal, it relies on the arguments of the County of Camden. Hence, it will not be separately addressed in this opinion, but it is bound by our holdings here.
[2] Gloucester County was also included in the notice.
[3] While the County of Gloucester was named as a defendant and Penn Jersey Advance Inc., the owner of the Gloucester County Times was also permitted to intervene and was thereafter named as a plaintiff, the claims involving these two parties were dismissed pursuant to a stipulation whereby Gloucester County agreed to print its legal notices and advertisements in the Gloucester County Times pending the outcome of this suit.
[4] Subsequently, in an amended complaint, The Philadelphia Inquirer was named as a party.
[5] Although certain inserts are printed out of state, such as the comics which are printed in Virginia and certain magazine inserts which are printed in New Jersey, the newspaper itself is printed in Pennsylvania.
[6] Specifically, the statute provides in part that the sheriff, among other officers and persons:

[S]hall also cause the notice [of real estate sales] to be published ... in two newspapers, to be by him designated,
(a) both printed and published in the county where the real estate to be sold is located, one of which shall be either a newspaper published at the county seat of the county or a newspaper published in the municipality in the county having the largest population according to the latest census, or
(b) one printed and published in the county and one circulating in the county, if only one daily newspaper is printed and published in the county, or
(c) one published at the county seat and one circulating in the county, if no daily newspaper is published in the county, or
(d) both circulating in the county, if no newspapers are printed and published in the county.
[N.J.S.A. 2A:61-1.]
[7] The statute provided:

[T]he price for publishing any legal notice, sheriff's sale, or any order, citation, summons, or any other proceeding or advertisement required by law to be published in any newspaper, shall be forty cents per folio (one hundred words) for the first insertion and twenty cents per folio for each subsequent insertion after the first.
[L. 1857, c. 137.]
[8] We reject plaintiff's argument that because defendants did not file a cross-appeal, we have no jurisdiction to hear this argument. "[W]ithout having filed a cross-appeal, a respondent can argue any point on the appeal to sustain the trial court judgment." Chimes v. Oritani Motor Hotel, Inc., 195 N.J.Super. 435, 443, 480 A.2d 218 (App.Div.1984).
[9] We do not reach the procedural arguments including lack of standing under the Commerce Clause raised by the New Jersey Press Association.